## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DR. OCHEOWELLE OKEKE | * | CIVIL ACTION NO. 2:20-CV-00450 |
| | * | |
| VERSUS | * | JUDGE SUSIE MORGAN |
| | * | |
| ADMINISTRATORS OF THE TULANE | * | MAGISTRATE JUDGE |
| EDUCATIONAL FUND | * | KAREN WELLS ROBY |
| AND DR. JEFFREY WIESE | * | |

## TULANE'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, the Administrators of the Tulane Educational Fund ("Tulane"), submits this Reply Memorandum in Support of its case-dispositive Motion for Summary Judgment. Plaintiff's Opposition does not raise contested *material* facts or any jurisprudence that defeats Tulane's well-founded Motion. She devotes much of her Opposition to inflammatory allegations unrelated to her claims and legal theories not included in her Complaint, while neglecting to significantly address the claims she did include and how she was damaged. It is clear from Plaintiff's Opposition that she and her few supportive witnesses understand neither the structure of the Internal Medicine residency program nor the ACGME requirements applicable thereto. Tulane briefly responds to Plaintiff's arguments in the numerical order they are set forth in the Opposition (R. Doc. 55).

1.    Plaintiff begins her Memorandum with a recitation of inflammatory and inapposite "facts" unrelated to her claims. Among the contentions with no citation to the record, because none exists, is this inaccuracy: "Dr. Wiese was removed as program director of Internal Medicine." (R. Doc. 55, p. 2). Plaintiff neglects to point out that Dr. Wiese *chose* to appoint Dr. Bhatnagar as Internal Medicine Program Director so that those duties would pose no conflict of interest with his larger role as the director of Tulane's entire graduate medical education

1

program.[1]  There was nothing punitive about this change.  While not a material fact for this Motion, Plaintiff's attempts to mischaracterize the record cannot be allowed to go unchecked.

      **2.**      Plaintiff devotes numerous pages of part 2 of her opposition to allegations about experiences of her Program Director, Dr. Princess Dennar, who is hardly a neutral witness because she is pursuing her own discrimination lawsuit against Tulane.[2]  Plaintiff cannot attempt to prove her claims by relying on some sort of "osmosis discrimination" theory.  Anecdotal evidence of discrimination against other employees must involve those similarly situated to Plaintiff; as a faculty member (not a resident) and Plaintiff's supervisor, Dr. Dennar is not similarly situated.  *Jackson v. Univ. of Tex. M.D. Anderson Cancer Center*, 172 F.Supp. 2d 860, 878 (5th Cir. 2001).  Plaintiff routinely cites irrelevant propositions and misconstrues testimony in an effort to support her claims.[3]  She cannot rely on Dr. Dennar's testimony that Dennar personally believes that Plaintiff experienced discriminatory treatment as proof of discriminatory treatment.  "A subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Heath v. Elaasar*, 763 F. App'x 351, 354 (5th Cir. 2019) (quotation omitted).

      **3.**      In section three, Plaintiff discusses mostly experiences of her Program Director, of which she has neither personal knowledge nor direct experience.  These incidents, if they even occurred, are irrelevant.  Plaintiff does not explain why the Court should find the word "culture" an automatic signifier of racial animus, and conveniently omits Dr. Wiese's testimony that by

---

[1] R. Doc. 51-4, p. 12 (Dr. Wiese 30(b)(6) Depo, p. 69:16-22).

[2] *Dennar v. The Administrators of the Tulane Educational Fund*, No. 2:20-cv-2679 (E.D. La. 2020).  Tulane fully denies the claims in Dr. Dennar's lawsuit.

[3] For example, the racial composition of the City of New Orleans compared to Tulane's residency program, which attracts applicants from all over the world, is irrelevant to the question of whether she experienced discriminatory treatment.  *See Carter v. Luminant Power Servs. Co.,* No. 3:10-cv-1486; 2011 U.S. Dist. LEXIS 140931, at *106 n.31 (N.D. Tex. Dec. 6, 2011).

this term he was referring to the Medical School culture, the "shared roles, goals, expectations, and beliefs" needed to ensure that residency programs operated cohesively.[4]

"The med-peds program is . . . two residency programs being done within four years, and so the med-peds requirements are much stricter than the internal medicine requirements."[5]  A Med-Peds resident is fulfilling the curricular requirements of two three year programs in four years rather than six years.  Of course their lives are busy and their workloads significant; but such is the nature of a combined residency.  ACGME Med-Peds Curricular requirements establish a minimum but not a maximum number of wards rotations and allow that for additional needs of the program the Med-Peds residents will help to fill in.[6]  Plaintiff's argument that ACGME limits the number of wards rotations that Med-Peds residents may do is flat wrong,[7] and another example of her fundamental lack of knowledge about ACGME requirements.

4.      It is curious that Plaintiff spends so much of her Opposition arguing about a breach of the resident agreement, as she has asserted no breach of contract claim herein.  Further, she offers the completely nonsensical conclusion that the lack of two additional weeks in the emergency room caused "an adverse change of employment status in violation of the contract." (R. Doc. 55, p. 7).  Nothing about her status ever changed, and so this is a complete misreading not only of the residency contract but of Title VII.  *See Simmons v. Methodist Hosps. of Dall.,* No. 3:11-cv-0017; 2012 U.S. Dist. LEXIS 58427, at *13 (N.D. Tex. Apr. 26, 2012) (claim that medical school refused to allow resident to complete a particular rotation was not an ultimate employment decision); *Ekmark v. Matthews*, 524 F. App'x 62, 64 (5th Cir. 2013) (determination

---

[4] R. Doc. 51-5, p. 7 (Dr. Wiese Individual Depo, pp. 105:7-106:10).
[5] R. Doc. 51-3, p. 2 (Dr. Bhatnagar Depo., p. 12:17-22).
[6] R. Doc. 51-3, p. 2 (Dr. Bhatnagar Depo, p. 12:4-9); R. Doc. 51-7, p. 10 (Dr. Marsh Depo, p. 41:9-42:12, p. 44:1-14).
[7] R. Doc. 51-5, p. 10 (Dr. Wiese Individual Depo. pp. 145:10-146:11).

3

of whether resident had fulfilled clinical residency requirements and qualified for certification was academic in nature).

The moonlighting claim is similarly unfounded.  Plaintiff requested and was granted permission to moonlight in her fourth year, and worked at a disability clinic making up to $1000 per shift.[8]  That Plaintiff felt unable to moonlight in urgent care or emergency rooms was strictly her own opinion; she admits that no one has ever denied her such work or told her she was unqualified to perform it.[9]  The vacation pay claim is also meritless.  She received two more weeks of paid time away from Tulane in her fourth year than her contract required,[10] after she chose to spend four weeks on a purely voluntary rheumatology rotation in her home state of Mississippi.[11]

Finally, Plaintiff's continuing identification of "a white comparator Michael Gillette, an Internal Medicine resident" (R. Doc. 55, p. 8) is another inaccurate representation.  Plaintiff is well aware, indeed admits in her response of "Uncontested" to Fact 23 in Tulane's Statement of Uncontested Facts,[12] that residents in the Global Health Program participate in away rotations as part of that program.  Dr. Gillette was part of that program and Plaintiff was not.[13]  He is not an appropriate comparator on the away rotation/vacation issue, because the Global Health Program covered his experience but not hers.  Plaintiff obviously has no appropriate comparator and therefore no credible evidence that she was treated differently than a similarly situated resident as to vacation time.  This claim too is meritless.

---

[8] R. Doc. 51-2, p. 5 (Plaintiff Depo, p. 32:14).
[9] R. Doc. 51-2, p. 11 (Plaintiff Depo, p. 63:24-64:18).
[10] All residents automatically receive one week off for Christmas or New Years, as well as four weeks of vacation scheduled by the residents at the scheduling meeting. R. Doc. 51-7, p. 10 (Dr. Marsh Depo, p. 44:1-2).
[11] R. Doc. 51-5, p. 6 (Dr. Wiese Individual Depo. p. 83:10-11).
[12] R. Doc. 55-17, p. 7.
[13] R. Doc. 51-2, p. 28, 34 (Plaintiff Depo, p. 182:2-7; p. 232:9-11); R. Doc. 51-5, p. 3 (Dr. Wiese Individual Depo, p. 14:11-25).

4

**5.**     As explained in Tulane's Memorandum in Support of its Motion,[14] Plaintiff fails to make a prima facie case of disparate treatment.

    **a.**     **Direct Evidence.**   "To qualify as direct evidence of discrimination, workplace comments must be 1) related to the protected class of persons of which plaintiff is a member; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Clark v. Champion Nat'l Sec.*, Inc., 952 F.3d 570, 581 (5th Cir. 2020) (quotation omitted); *see also Wright v. U.P.S.*, No. 20:3024, p. 3 (5th Cir. Jan., 22, 2021) (direct evidence shows discriminatory motive on its face). None of Plaintiff's "evidence" so qualifies. Plaintiff brings in her Program Director, Dr. Dennar, as ostensible support for the claim that she was denied adequate training. Dr. Dennar, as the Med-Peds Residency Program Director, is responsible for certifying that a Med-Peds resident is eligible to graduate[15] and has done so every year since she became director in 2008.[16] The use of a combination of emergency room rotations and innovative rotations to satisfy the emergency medicine training requirement has been in place for this entire period.[17] Dr. Dennar admitted that she has never formally challenged the propriety of the innovative rotations used in Internal Medicine, nor has she ever contacted ACGME to inquire as to whether Internal Medicine's innovative rotations meet ACGME emergency medicine training requirements for her residents.[18] Dr. Dennar also admitted that Dr. Wiese told her to contact ACGME about her emergency medicine training concerns and yet she never did so.[19] Further, Dr. Dennar's lack of knowledge of ACGME's views on the need for emergency

---

[14] R. Doc. 51-1 pp. 16-23.
[15] R. Doc. 51-9, p. 2 (Dr. Dennar Depo, p. 31:8-10). Dr. Dennar certified Plaintiff's eligibility to graduate.
[16] R. Doc. 55-1, p. 2 (Dr. Dennar Depo, p. 11:13-18).
[17] R. Doc. 51-1, p. 6 (Dr. Wiese 30(b)(6) Depo, p. 33:13-23).
[18] **Exh. 11A** (Dr. Dennar Depo, p. 102:11-23).
[19] R. Doc. 55-1, p. 43-44 (Dr. Dennar Depo, p:81:20-82:2).

medicine training for internal medicine doctors is illustrated in her testimony that she was not even aware that ACGME was removing that training requirement effective in 2023.[20]

      **b.**    **Adverse employment action.**  Plaintiff argues, contrary to established law, that because she believes her "job" was changed to be objectively worse, she experienced an adverse employment action.  But a change in job responsibilities does not constitute an adverse action "unless the change is so drastic as to constitute a functional demotion."  *Price v. Wheeler*, 2020 U.S. App. LEXIS 34297, at *7 (5th Cir. Oct. 30, 2020).  Plaintiff identified no drastic changes that would constitute a functional demotion: she received the five weeks of paid vacation per year to which her residency agreement entitled her,[21] she received permission to moonlight as soon as she requested it,[22] and she timely graduated from the Med-Peds Residency Program on the basis of her Program Director's certification that she fulfilled the curricular requirements.[23] Plaintiff was never placed on probation, demoted, paid less than her agreed-upon stipend, or prevented from progressing to the next residency year.[24]  She was therefore never subjected to an adverse employment action.  *See Matthews v. Pilgrim's Pride,* 783 F. App'x 346, 349 (5th Cir. 2019) (plaintiff did not prove a demotion when she maintained the same position in terms of title, compensation, and benefits).

      That Plaintiff lacked two additional emergency room weeks or found her schedule "harder" or "more difficult" is irrelevant to whether she experienced an adverse employment action under the law.  *See Oller v. Roussel,* 609 F. App'x 770, 773 (5th Cir. 2015) ("That [plaintiff] might find his teaching assignments undesirable or might prefer other assignments is not material to this determination [of adverse employment action]."); *Southard v. Tex. Bd. of*

---

[20] **Exh. 11A** (Dr. Dennar Depo, p. 176:17-22).
[21] R. Doc. 51-2, p. 10 (Plaintiff Depo, p. 58:24-59:1).
[22] R. Doc. 55-1, p. 60 (Dr. Dennar Depo, p. 141:14-142:7).
[23] R. Doc. 51-2, p. 8 (Plaintiff Depo., p. 48:1-7); R. Doc. 55-1, p. 84 (Dennar Depo, p. 275:5-21).
[24] R. Doc. 51-2, p. 6 (Plaintiff Depo, p. 34:3-4, 8-17; 35:4-5).

*Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997) ("Undesirable work assignments are not adverse employment actions.").  Plaintiff's systole allotment, combined with her paired rotator, was consistent with those of the Internal Medicine residents in her firm.[25]   The ACGME reviewed Plaintiff's schedule, and, as Dr. Dennar noted, did not issue a citation for insufficient emergency medicine training.[26]   In fact, ACGME has never cited Tulane for insufficient emergency medicine training.[27]   Plaintiff's concern in this regard is wholly unfounded.

**Comparators.**   Plaintiff refers broadly to *all* white male Internal Medicine residents as appropriate comparators.  This definition must be rejected.  Plaintiff does not identify these comparators with particularity or establish that they are similarly situated to her.[28]   Some of those male residents are first year interns, others have Chief Resident duties,[29] others are in different dual programs or Global Health,[30] or took long-term medical or family leave.  They are not *all* appropriate comparators.  *See Saketkoo v. Tulane Univ. Sch. of Med.,* No. 19-12578, 2020 U.S. Dist. LEXIS 245000, at *19 (E.D. La. Dec. 31, 2020) (Africk, J.) (plaintiff failed to identify an appropriate comparator when she did not "(1) identify any particular individual and (2) establish that they are sufficiently similarly situated to [plaintiff] to be a comparator").  Plaintiff herein meets this same fate due to her broad, unsubstantiated generalization of appropriate comparators. Plaintiff admitted she cannot identify a comparator[31] with regards to her emergency medicine

---

[25] R. Doc. 51-1, p. 7 (Dr. Wiese 30(b)(6) Depo, pp. 39:11 – 41:3); R. Doc. 51-7, p. 10 (Dr. Marsh Depo, pp. 41:11-44:15).  Dr. Marsh described the Excel calculator of systole rotations and how the rotations were substantially even across the red firm residents.  (*Id.*, p. 42:10, 43:8, 11).

[26] R. Doc. 51-9, p. 4 (Dr. Dennar Depo, p. 192:18-23).

[27] R. Doc. 51-4, p. 6 (Dr. Wiese 30(b)(6) Depo, p. 36:11-14).

[28] R. Doc. 51-2, p. 19 (Plaintiff Depo, p. 121:7-14).

[29] Plaintiff testified that Dr. Peter Caldwell was her Chief Resident.  R. Doc. 51-2, p. 3 (Plaintiff Depo, p. 24:13-19).

[30] Tulane did not address Dr. Peter Caldwell as a comparator with regards to away rotations because, as Plaintiff is well-aware, Dr. Wiese testified that although international away rotations are common for Global Health residents, he knew of no resident other than Plaintiff who completing a domestic away rotation. R. Doc. 51-1, p. 17 (Dr. Wiese 30(b)(6) Depo, p. 125:6-24).  In response to Plaintiff's Request for Production no. 37, Tulane identified all Global Health residents; Dr. Caldwell was not one.

[31] Nor does Plaintiff identify any white males who were treated differently than she with regards to moonlighting.

claim: "I never said anyone had more emergency medicine rotations than me."[32]  This is fatal to her contention that she was treated differently as to emergency medicine training.

        **c.**      **"Statistical" Evidence?**  Plaintiff expects the Court to accept her own self-serving "statistical analysis" set forth in her Declaration:  "I calculated the statistical calculations as indicated in the Opposition to the Motion for Summary Judgment . . . .[33]  Plaintiff apparently confuses the role of statistics in pattern or practice/disparate impact cases, where statistical proof is at the core of relevant evidence, with the type of data necessary in a disparate treatment case like this case.  This is not a disparate impact case; Plaintiff never pled that and the time to add such a claim has long passed.[34]  It certainly cannot be added in an opposition memorandum.  Further, the type of statistical analysis required is not a Declaration of opinion by this Plaintiff, who is a rheumatologist.  It would require a regression analysis or other valid statistical comparison showing a disproportionate exclusionary impact on a protected class – not, as Plaintiff does herein, on a handful of selected supporters.  Aside from its relevance, there are serious questions as to the reliability of the "statistics" offered by Plaintiff herein, and it should be rejected.  *See, e.g., Jackson v. Watkins*, 619 F.3d 463, 468 (5th Cir. 2010) (statistical data insufficient to raise genuine issue of material fact in cases where plaintiff presents no additional evidence that nondiscriminatory reasons are pretext); *Crim v. Helfer*, 1996 U.S. App. LEXIS 44305, at *5 (5th Cir. Jan. 16, 1996) ("Statistical evidence on small groups of employees cannot be used to establish an employer's discriminatory intent.").

        Plaintiff did not analyze the schedules of all Med-Peds residents as compared to all Internal Medicine residents but rather relied on a small group, leaving open the question of whether any discrepancies were due to race or gender or due to a variable such as enrollment in

---

[32] R. Doc. 51-2, p. 33 (Plaintiff Depo, p. 225:13-14).
[33] Declaration of Plaintiff, R. Doc. 55-11, ¶ 3.
[34] The Scheduling Order in this case, R. Doc. 17, established June 8, 2020 as the last date to amend pleadings.

different residency programs.  Relying on only a snapshot of data is insufficient.  *See Lindsley v. Omni Hotels Mgmt. Corp*., No. 3:17-CV-2942; 2019 U.S. Dist. LEXIS 109420, at *40 (N.D. Tex. July 1, 2019) (rejecting statistical evidence that was unsupported by expert testimony, did not go through any formal statistical analysis, did not control for variables, and, crucially, did not connect the purported disparities to a specific employment practice).  The same result should occur herein.

6.      Plaintiff's last minute disparate-impact claim must be disregarded entirely. Plaintiff only pled disparate treatment, not disparate impact.  (Complaint, R. Doc. 1, ¶ 57, 64). Plaintiff cannot be permitted, at this late stage, to modify her theory of the case and add a claim not included in her Complaint and that requires an entirely different approach to the discovery process and the use of experts than does a disparate treatment claim.  *See McGee-Hudson v. AT&T*, 587 F. App'x 134, 135 (5th Cir. 2014) (affirming district court's decision not to address disparate impact claim because complaint alleged only disparate treatment).

7.      As to the hostile work environment claim, Plaintiff did not – and cannot – rebut Tulane's argument that the interactions with Dr. Wiese and others fail to rise to an actionable level.  She instead argues that the Court should consider the Declarations of Drs. Johnson, Udemgba and Watts in some sort of "totality of circumstances" analysis to enhance the paucity of her own experiences.  This is contrary to Title VII jurisprudence.  Another employee's "subjective belief and unproven allegations" that action was taken against her because of her protected class "is not evidence that she was discriminated against, let alone evidence that [the plaintiff] was discriminated against."  *Brown v. Home Depot U.S.A., Inc*., No. 14-1470, 2015 U.S. Dist. LEXIS 56874, *36 (E.D. La. April 30, 2015); *Richardson v. United Airlines, Inc*., No. 18-01707, 2019 U.S. Dist. LEXIS 206398, *20 (S.D. Tex. Oct. 31, 2019).  Plaintiff did not

9

experience a hostile work environment because none of her claims, individually or collectively, rises to the level of severe, pervasive, physically threatening or humiliating. *Price v. Wheeler*, 2020 U.S. App. LEXIS 34297, at *17 (5th Cir. Oct. 30, 2020).

**8.**     Plaintiff protests that she "has not filed for educational malpractice." (R. Doc. 55, p. 25). While this is true, the point is that courts have routinely found that the type of claims she asserts are educational malpractice claims – regardless of how they are styled. In claiming that Tulane's residency program did not adequately train her, she is asking the Court to make a determination about the quality of her graduate medical education. *See Ekmark v. Matthews*, 524 F. App'x 62, 64 (5th Cir. 2013); *Basso v. N.Y. Univ.*, No. 16 Civ. 7295, 2020 U.S. Dist. LEXIS 223211, at *43-44 (S.D.N.Y. Nov. 30, 2020) ("complaints about the general quality of the education . . . and invitations for courts to make comparative value judgments between academic programs both constitute essentially repackaged actions asserting educational malpractice"). Plaintiff identifies no cases that refute this point. Summary judgment is warranted.

## CONCLUSION

Plaintiff's Opposition raises no meritorious legal arguments and identifies no material facts in dispute. For the reasons set forth herein and in Tulane's Memorandum in support of its Motion for Summary Judgment, Tulane respectfully requests that the Court grant its Motion and dismiss Plaintiff's claims in full, with prejudice.

Respectfully Submitted:

By:  /s/ Julie D. Livaudais
    Julie D. Livaudais, T.A. (La. Bar No. 1183)
    Rosalie M. Haug (La. Bar No. 37720)
       -of-
    **CHAFFE McCALL, L.L.P.**
    1100 Poydras Street
    2300 Energy Centre
    New Orleans, LA  70163-2300

3996730-1

Telephone:  (504) 585-7000
Facsimile: (504) 544-6054
Email:      livaudais@chaffe.com
            haug@chaffe.com

***Attorneys for Defendant, The Administrators
of the Tulane Educational Fund***

11

3996730-1