## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**DR. OCHEOWELLE OKEKE,**
    **Plaintiff**

**CIVIL ACTION**

**VERSUS**

**NO.  20-450**

**ADMINISTRATORS OF THE
TULANE EDUCATIONAL FUND,**
    **Defendant**

**SECTION: "E"**

## ORDER AND REASONS

Before the Court is the motion of the Administrators of the Tulane Educational Fund ("Tulane") for summary judgment on Plaintiff's claims of disparate treatment race and gender discrimination[1] and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.[2] For the reasons that follow, the motion is **GRANTED.**

## PROCEDURAL BACKGROUND

On November 11, 2019, Plaintiff received a notice of right to sue from the EEOC.[3] Tulane does not argue in its motion for summary judgment that Plaintiff has failed to administratively exhaust her Title VII claims.[4]

---

[1] Plaintiff argues in her opposition and sur-reply to the motion for summary judgment that she also has brought claims for disparate *impact* race and sex discrimination. R. Doc. 55 at 9, 22; R. Doc. 65 at 6-7. The Court will by separate order extend the deadline for filing dispositive motions with respect to such claims. The Court considers in this order only Tulane's motion to dismiss Plaintiff's disparate treatment claims.

[2] R. Doc. 51. Plaintiff opposes the motion. R. Doc. 55. Tulane has filed a reply in support of its motion. R. Doc. 61. Plaintiff filed a sur-reply in opposition to the motion. R. Doc. 65.

[3] R. Doc. 30 at ¶ 9.

[4] In its answer, Tulane admits "the EEOC issued a Notice of Right to Sue on November 6, 2019" but denies Plaintiff's allegations with respect to administrative exhaustion "for lack of sufficient information to justify a belief therein." R. Doc. 11 at ¶ 9.

On February 7, 2020, Plaintiff filed a complaint in this Court bringing claims of race and gender discrimination and hostile work environment.[5] On January 6, 2021, Tulane filed the instant motion seeking summary judgment in its favor on all of Plaintiff's claims.[6]

## FACTUAL BACKGROUND

The following facts are not in dispute. Plaintiff Dr. Okeke attended Tulane's Combined Residency Program in Internal Medicine and Pediatrics ("Med-Peds") from 2014-2018.[7] Following her residency, Plaintiff attended her top-choice fellowship program at the University of St. Louis School of Medicine and now has an unrestricted license to practice medicine in Missouri.[8] She is certified by the American Board of Internal Medicine and the American Board of Pediatrics.[9]

The Accreditation Council for Graduate Medical Education ("ACGME") is the accrediting body for graduate medical education programs and establishes standards for programs across the country.[10]

Plaintiff was never put on probation or formally disciplined while in her residency.[11] She was paid her full stipend each year.[12] The annual stipend for residents, including Plaintiff, ranged from $44,168 in her first year to $53,649.00 in her fourth year.[13] Plaintiff did an "away" rotation in rheumatology in Jackson, Mississippi.[14] Plaintiff

---

[5] R. Doc. 1. On November 12, 2020, Plaintiff filed a Revised Amended Complaint. R. Doc. 30. The substantive allegations are virtually identical.
[6] R. Doc. 31-1 at 7.
[7] R. Doc. 51-10 at ¶ 1; R. Doc. 55-17 at ¶ 1.
[8] R. Doc. 51-10 at ¶ 2; R. Doc. 55-17 at ¶ 2.
[9] *Id.*
[10] R. Doc. 51-10 at ¶ 7; R. Doc. 55-17 at ¶ 7. *See* R. Doc. 30 at ¶ 14 ("The Meds-Peds program is a four (4) year program accredited by [ACGME].")
[11] R. Doc. 51-10 at ¶ 3; R. Doc. 55-17 at ¶ 3.
[12] *Id.*
[13] R. Doc. 51-10 at ¶ 4; R. Doc. 55-17 at ¶ 4.
[14] R. Doc. 51-10 at ¶ 21; R. Doc. 55-17 at ¶ 21.

did not participate in Tulane's Global Health Residency Program, which allows residents to do away rotations overseas.[15]

Tulane has a published nondiscrimination policy.[16]

## **STANDARD**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[17] "An issue is material if its resolution could affect the outcome of the action."[18] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[19] All reasonable inferences are drawn in favor of the nonmoving party.[20] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[21]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[22] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the

---

[15] R. Doc. 51-10 at ¶ 23-24; R. Doc. 55-17 at ¶ 23-24.

[16] R. Doc. 51-10 at ¶ 25; R. Doc. 55-17 at ¶ 25.

[17] Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[18] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

[19] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

[20] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[21] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

[22] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).

record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[23]

If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[24] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled to summary judgment as a matter of law.[25] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[26] Under either scenario, the burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[27] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must

---

[23] *Celotex*, 477 U.S. at 322–24.

[24] *Id.* at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the Movers to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); *Fano v. O'Neill*, 806 F.2d 1262, 1266 (citing Justice Brennan's dissent in *Celotex*, and requiring the movant to make an affirmative presentation to negate the nonmovant's claims on summary judgment); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).

[25] *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

[26] *Celotex*, 477 U.S. at 332–33.

[27] *Id.*

4

either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[28] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[29]

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[30]

## LAW AND ANALYSIS

### I.    Plaintiff does not bring educational malpractice claims.

Tulane argues Plaintiff's claims are based on her opinion of the education and training she received at Tulane and, as such, are educational malpractice claims not cognizable under Title VII.[31]  This argument is more in the nature of a motion to dismiss and, in fact, Tulane concludes this section with a request that the action be dismissed.[32] In support of its argument, Tulane points to *Davis v. Mann*, a Fifth Circuit case in which a resident was simultaneously terminated from his residency and his academic program

---

[28] *Celotex*, 477 U.S. at 332–33, 333 n.3.
[29] *Id.*; *see also First National Bank of Arizona*, 391 U.S. at 289.
[30] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[31] R. Doc. 51-1 at 11-15.
[32] *Id.* at 15.

based on poor academic performance.[33] The court recognized "the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program."[34] The resident filed a Fourteenth Amendment due process claim but *not* a Title VII action. The court granted the defendants' motion for summary judgment on the due process claim recognizing that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection as employees terminated from their jobs.[35] *Davis* does not stand for the proposition that a resident *cannot* bring an employment discrimination claim under Title VII.

A medical residency is both an employment relationship and an educational relationship. As a result, a medical resident may have an employment discrimination claim under Title VII, as well as other education-related actions. "For this reason, courts have examined the context of the cause of action to determine whether the resident is to be treated as an employee or a student in a given case."[36] In *Doe v. Mercy Catholic Med. Center*, a former resident brought a claim against a hospital asserting Title IX claims, as well as hostile work environment, retaliation, and quid pro quo harassment. [37] Although the former resident did not file a Title VII claim against the hospital as an "employee, like other residents have done before," the court noted that, if she met the exhaustion requirements of Title VII, she could have done so because Title VII has concurrent

---

[33] *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989).
[34] *Id.*
[35] *Id.* at 973.
[36] *Knapik v. Mary Hitchcock Memorial Hosp.,* 90 F. Supp. 3d 292 (District of Vermont 2015).
[37] *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 555 (3rd Cir. 2017) (quoting *O'Connor v. Davis*, 126 F.3d 112, 117 (2nd Cir. 1997)).

applicability.[38] "Congress provided a 'variety of remedies,' at times overlapping, to 'eradicate' private-sector employment discrimination."[39]

In this case, Tulane argues Plaintiff's claims are "about purely academic decisions concerning training rotations" and are "properly considered educational malpractice claims. And Title VII is not applicable."[40] This is not accurate. Plaintiff elected to pursue the remedies available to her as an employee under Title VII. To state a claim as an employee under Title VII, a resident must allege the defendant acted discriminatorily concerning the resident's status as an employee.[41] Plaintiff complains about Tulane's discriminatory treatment of her in the employment context based on her sex and race. Plaintiff's residency was not terminated for poor academic or clinical performance. Plaintiff has not complained about the quality of Tulane's residency program. The Court has not been asked to make a decision based on the quality of Tulane's academic program or other purely academic issues.

To determine whether an employee has stated an employment claim under Title VII requires a two-step analysis: (1) determining "whether the defendant falls within Title VII's statutory definition of an 'employer'" and (2) determining "whether an employment relationship exists between the plaintiff and the defendant."[42] The analysis is described by the Fifth Circuit as:

> To determine whether an employment relationship exists within the meaning of Title VII, "we apply a 'hybrid economic realities/common law control test.'" The most important component of this test is "[t]he right to control [the] employee's conduct." "When examining the control component, we have focused on whether the alleged employer has the right"

---

[38] *Id* citing *Takele v. Mayo Clinic*, 576 F.3d 834 (8th Cir. 2009).
[39] *Id.*
[40] R. Doc. 51-1 at 13.
[41] *Bucklen v. Resselaer Polytechnic Inst.*, 166 F.Supp.2d 721, 725 (N.D.N.Y. 2001).
[42] *Muhammad v. Dallas Cnty. Cmty. Supervision and Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007) (citations omitted).

to hire, fire, supervise, and set the work schedule of the employee. "State law is relevant insofar as it describes the plaintiff's position, including his duties and the way he is hired, supervised and fired." The economic realities component of the test focuses on "whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment."[43]

Tulane qualifies as an employer under Title VII's definition, as it is an entity "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[44] With respect to whether there was an employment relationship between the Plaintiff and Tulane, the Tulane Resident Agreement signed by the parties outlines a stipend "subject to the appropriate federal and state income tax, social security tax, and any other applicable deductions."[45] The agreement provides for benefits including "support services," "insurance," and "professional insurance."[46] It set the terms and conditions of the residency by stipulating a period ("07/01/2017 through 06/30/2018")[47] and outlining expectations (e.g., "Act in a professional and ethical manner.").[48] An employment relationship existed between the Plaintiff and Tulane under this Circuit's Title VII jurisprudence. Plaintiff has the right to, and has elected to, pursue her employment-related remedies under Title VII.

## II.   Summary judgment is granted on Plaintiff's Title VII disparate treatment sex and race discrimination claims.

Count one of Plaintiff's complaint is that Tulane treated her "differently from similarly-situated non-female employees in the terms and conditions of employment,

---

[43] *Id.* at 380 (citations omitted).
[44] 42 U.S.C. § 2000e(b).
[45] R. Doc. 55-9 at ¶ 2.
[46] *Id.* at ¶ 4(a)-(c).
[47] *Id.* at Preamble.
[48] *Id.* at ¶ 4(k).

based on unlawful consideration of gender, female."[49] Count two of Plaintiff's complaint is that Tulane "treated Dr. Okeke differently from similarly situated non-Black employees in the terms and conditions of employment, based on unlawful consideration of race, Black."[50]

Plaintiff bears the burden of showing both disparate treatment and discriminatory motive.[51] A plaintiff may use either direct or circumstantial evidence to prove a case of intentional discrimination under Title VII.[52] "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption."[53] If a plaintiff presents direct evidence, the *McDonnell Douglas* test does not apply.[54] More often, a plaintiff relies on circumstantial evidence, which requires the court to apply the *McDonnell Douglas* burden-shifting analysis.[55] Under the *McDonnell Douglas* test, the plaintiff must first demonstrate a prima facie case of discrimination.[56] If successful, the burden of production shifts to the defendant to show a legitimate and nondiscriminatory basis for the adverse employment decision.[57] Finally, the plaintiff must show the defendant's proffered reason is pretextual or unworthy of belief.[58]

To determine which analysis to apply, the Court first looks to whether there is direct evidence of intentional discrimination. "[D]irect evidence is rare."[59] "In the context of Title VII, direct evidence includes any statement or written document showing a

---

[49] R. Doc. 30 at ¶ 57.
[50] *Id*. at ¶ 64.
[51] *Johnson v. Chapel Hill Indep. Sch. Dist.,* 853 F.2d 375, 381 (5th Cir. 1988).
[52] *U.S. Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 n. 3 (1983).
[53] *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (1993).
[54] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)
[55] *Smith v. Touro Infirmary,* 2015 WL 5093487 at *2 (E.D. La. Aug. 28, 2015) (applying *McDonnell Douglas* analysis to determine motion for summary judgment).
[56] *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir. 1994) (applying *McDonnell Douglas* test).
[57] *Id.*
[58] *Id.*
[59] Clark v. Champion National Security, Incorporated, 952 F.3d 570, 579 (5th Cir. 2020).

discriminatory motive on its face."[60] "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption."[61]

The Plaintiff argues she has provided direct evidence of discrimination,[62] and points to the deposition of Dr. Dennar to show "Dr. Wiese required Dr. Dennar to sign off on the graduation even though Plaintiff lacked graduation requirements."[63] Plaintiff argues this behavior was "race motivated even if positive" because she and others Black women in Med-Peds did not meet one or more requirements for graduation.[64] The portions of Dr. Dennar's deposition testimony cited by Plaintiff do not support this assertion.[65] Instead, Dr. Dennar testified she did not recall a specific conversation with Dr. Weise about Plaintiff's completion of the residency program and certification.[66] Plaintiff also argues Tulane faculty members assumed Plaintiff had failed some academic standards because she was Black and that this is direct evidence of discrimination.[67] Plaintiff points to Dr. Dennar's testimony that faculty members assumed Plaintiff and other Med-Peds residents had fallen short in their academic performance because they were Black,[68] but this was an assumption on Dr. Dennar's part. Dr. Dennar did not testify that any faculty member made a comment, orally or in writing, that he assumed Plaintiff or others had fallen short academically because they were Black. Plaintiff points to an email sent by Dr. Wiese, the Chairman of the Department of Internal Medicine, to Nick Verne, in which Dr. Wiese states he is "considering reducing the number of Med-Peds

---

[60] *Portis v. First Nat'l Bank of New Albany, Miss.,* 34 F.3d 325, 329 (5th Cir. 1994).
[61] *Id.*
[62] R. Doc. 55 at 10-11.
[63] *Id.*
[64] Id. at 11.
[65] R. Doc. 55-1 at 84.
[66] *Id.*
[67] R. Doc. 55 at 11.
[68] R. Doc. 55-1 at 14-15.

students to four rather than six because of a "cultural issue" in the program.[69] In the remainder of the email, Dr. Wiese went on to say that there were, he believed, "some excessively elevated expectations (and when those excessively elevated expectations are not met, people are unhappy.) Having a more manageable number might allow addressing those expectations."[70] At his deposition, Dr. Wiese testified that by this term he was referring to the medical school culture, the "shared roles, goals, expectations, and beliefs" needed to ensure the residency program operated collaboratively.[71] The Court would be required to infer discrimination based on Dr. Wiese's reference to cultural issues; this is not direct evidence of intentional discrimination. Finally, Plaintiff points to occasions on which Dr. Wiese did not know her name, did not congratulate her on her fellowship, and criticized her for failing to be a team player.[72] Although this may be rude behavior, it is far from direct evidence of intentional discrimination.

To qualify as direct evidence of discrimination, workplace comments must be 1) related [to the protected class of persons of which plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.[73] Plaintiff has not met even the first prong of this test, as she produced no evidence of workplace comments, written or oral, relating to women or Blacks. Plaintiff has not provided direct evidence that any action taken by Tulane was based on her being a woman or being Black. Instead, the evidence is open to other plausible interpretations. The Court would be forced to resort to inferential methods of proof to find, based on the evidence provided, that

---

[69] R. Doc. 55-7.
[70] *Id.*
[71] R. Doc. 51-5 at 7.
[72] R. Doc. 55 at 6.
[73] Clark v. Champion National Security Incorporated, 952 F.3d 570, 581 (5th Cir. 2020) (citation omitted).

Tulane's actions were based on illegitimate criterion. In the absence of direct evidence showing Defendant's alleged discriminatory motive, Plaintiff relies on circumstantial evidence, and as a result the *McDonnell Douglas* framework applies.[74]

To make a prima facie case under *McDonnell-Douglas*, "any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."[75] The Fifth Circuit explained the function of the prima facie case in *Texas Dept. of Community Affairs v. Burdine*:

> The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. As the Court explained in *Furnco Construction Corp. v. Waters*, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.[76]

To make a prima facie case for disparate treatment sex or race discrimination under Title VII, Plaintiff must show she: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group."[77] Tulane admits Plaintiff is a member of a protected group

---

[74] *See Smith v. Touro Infirmary,* 2015 WL 5093487 at *2 (E.D. La. Aug. 28, 2015).

[75] *International Broth. of Teamsters v. U.S.,* 431 U.S. 324, 358 (1977); *Harris v. Drax Biomass Incorporated,* 813 Fed. Appx. 945 (5th Cir. 2020).

[76] 450 U.S. 248 at 253-54 (F181) (internal citations omitted).

[77] *Price v. Wheeler,* 834 Fed. Appx. 849 (5th Cir. 2020); *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir. 2007); *See also Abarca v. Metro Transit Auth.,* 404 F.3d 938, 941 (5th Cir. 2005) (holding that plaintiff had to show he was treated "treated differently from others similarly situated").

and was qualified to be a Med-Peds resident.[78] Tulane argues it is entitled to summary judgment in its favor because Plaintiff has failed to make a prima facie case with respect to the third and fourth elements of her disparate treatment sex and race discrimination claims.[79]

The third element of Plaintiff's prima facie case of disparate treatment sex and race discrimination requires her to show that she "was discharged or suffered some adverse employment action by" Tulane.[80] Plaintiff does not allege she was discharged but she does allege she suffered adverse employment actions when Tulane "forced a more difficult and intensive rotation schedule on her;"[81] "gave her more assignments to the Gemini service (wherein she had no full days off);"[82] "prohibited [her] from completing her required four [] weeks of Emergency Medicine rotation" as required by the ACGME;[83] "forced her to use some of her paid vacation time while enrolled in electives at outside institution(s);"[84] and forced her to forgo her "elective and/or subspecialty time in order to provide jeopardy coverage to other residents, despite not being scheduled to do so."[85] Plaintiff also alleged that she received fewer electives and subspecialty rotations and was not permitted to swap rotations.

"An adverse employment action is 'a judicially-coined term referring to an employment decision that affects the terms and conditions of employment.' We have consistently held that an adverse employment action is an 'ultimate employment decision,

---

[78] R. Doc. 51-1 at 17.
[79] *Id.*
[80] *McCoy*, 492 F.3d at 556.
[81] R. Doc. 30 at ¶ 40(a).
[82] *Id.* at ¶ 40(b).
[83] *Id.* at ¶ 40(c) and (d).
[84] *Id.* at ¶ 40(e).
[85] *Id.* at ¶ 40(f).

such as hiring, granting leave, discharging, promoting, or compensating."[86] "[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."[87] "Title VII does not, however, address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."[88] Instead, the Fifth Circuit has a strict interpretation of what constitutes an adverse employment action under Title VII.[89] In *Price v. Wheeler*, the Fifth Circuit explained:

> Suspension aside, none of the allegedly discriminatory acts constitute an ultimate employment decision. *Id.* For example, Price alleges that a supervisor withheld a particular format needed to complete a task, removed specified documents from a database, failed to sign a document that she had prepared, and declined to meet with her about a particular matter. But "allegations involv[ing] administrative matters" are generally "not adverse employment actions." *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) (refusing to "micromanage" an *856 employer's administrative decisions). Neither does a loss or addition of (or change in) job responsibilities constitute an adverse action unless the change is so drastic as to constitute a functional demotion. *See Thompson*, 764 F.3d at 504 ("In certain instances, a change in or loss of job responsibilities—similar to the transfer and reassignment contexts—may be so significant and material that it rises to the level of an adverse employment action."); *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997) ("Undesirable work assignments are not adverse employment actions."). Therefore, Price's allegation that she was asked at least once to perform administrative tasks outside her job description does not further her case. [90]

The Plaintiff's complaints concern her work assignments, which she considered time-consuming and difficult. Plaintiff argues her intensive rotation schedule, her assignments to the Gemini service, her assignments to jeopardy coverage, and Tulane's refusal to assign her to four weeks of emergency medicine rotation qualify as adverse

---

[86] *Price v. Wheeler*, 834 Fed. Appx. 849 (5th Cir. 2020) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)).
[87] *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).
[88] Banks v. East Baton Rouge Parish School Board, 320 F.3d 570 (5th Cir. 2003).
[89] *Id.*
[90] 834 Fed. Appx. 849, 855-56 (5th Cir. 2020).

employment actions.[91] Tulane relies on *Jackson v. Honeywell International Incorporated* for the proposition that less favorable work assignments do not constitute an adverse employment action because they are not ultimate employment decisions.[92]  In *Jackson*, an individual plaintiff argued he received less favorable work assignments such as writing code and being assigned to work on two tasks over a four month period. The Plaintiff in this case attempts to distinguish her case from *Jackson* by offering declarations from several Black female Med-Peds residents, who she argues all had heavier workloads, as "pattern and practice evidence under FRE 404(b)(2)."[93] Just as the plaintiff in *Jackson*, Plaintiff has brought individual claims for disparate treatment race and gender discrimination. The EEOC is not the plaintiff in this case. Only the EEOC may pursue pattern and practice cases under Section 706 of Title VII. The declarations from Plaintiff's Black female colleagues do not distinguish her case from *Jackson*. It is clear that in the Fifth Circuit undesirable work assignments are not adverse employment actions.[94] Neither is the denial of a scheduling request.[95]

Plaintiff next argues the undesirable work assignments alleged are so significant and material that Tulane's actions rose to the level of an adverse employment action because they made her job objectively worse. A plaintiff's subjective preference is irrelevant under Title VII; the proper standard is an objective one.[96]  "[A]n employer's

---

[91] R. Doc. 55 at 14.

[92] 601 Fed. Appx. 280 (5th Cir. 2015).

[93] R. Doc. 55 at 14.

[94] Tulane referenced *Feingold v. New York*, 366 F.3d 138 (2nd Cir. 2004), and other cases for the proposition that a disproportionately heavy work is an adverse employment action. R. Doc. 55 at 14. *Feingold* is an out-of-circuit case and, furthermore, Plaintiff did not allege that she had a disproportionately heavy workload—only that she and other Black female residents were unable to complete their required training and unable to moonlight. R. Doc. 55 at 18. As mentioned earlier, this is not a pattern and practice case brought by the EEOC and allegations regarding Plaintiff's colleagues may not be used to support her complaint.

[95] *Thompson v. City of Waco*, 764 F.3d 500, 503-04 (5th Cir. 2014).

[96] *Pegram v. Honeywell*, 361 F.3d 272 (5th Cir. 2004).

action may constitute an adverse employment action if it 'makes the job objectively worse.'"[97] In *Thompson v. City of Waco*, a Black police detective brought Title VII claims against his employer after it imposed written restrictions on him for falsifying time sheets when the city opted not to impose the same punishment on two white police detectives who committed the same infractions.[98] Unlike his white counterparts, the plaintiff was restricted "to such an extent that he no longer occupie[d] the position of a detective; he now function[ed] as an assistant to other detectives. Although a detective in name, [the plaintiff] allege[s] that he [could] no longer "detect"—that is, search for evidence— without supervision."[99] The Court found that by effectively placing him in "a new and objectively worse position, with significantly diminished material responsibilities,"[100] the plaintiff "state[d] a plausible claim that he was subject to the equivalent of a demotion."[101]

In this case, Plaintiff has not alleged that Tulane's actions were equivalent to a demotion but instead argues the harms she suffered were significant and material. Plaintiff has not shown that Tulane's actions placed her in a new and objectively worse position, with significantly diminished responsibilities. Plaintiff maintained her title, pay, and full responsibilities as a medical resident throughout her entire tenure at Tulane and, in fact, graduated from the program.[102] In *Williams v. Du Pont*, a Black plaintiff's Title VII claims survived summary judgment after the court found there was "a question of fact as to whether there was a significant change in duties . . . ."[103] In *Williams*, the plaintiff claimed he experienced a "change in duties" after being transferred to a new work shift

---

[97] *Williams v. E.I. du Pont  de Nemours and Company*, 180 F. Supp.3d 451 (M.D. La. Apr. 11, 2016).
[98] *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014).
[99] *Id*. at 505.
[100] *Id*.
[101] *Id*. at 506.
[102] R. Doc. 51-2 at 6.
[103] *Williams v. E.I. du Pont de Nemours and Company*, 180 F. Supp.3d 451, 456-58 (M.D. La. Apr. 11, 2016).

under a supervisor who was universally disliked and considered a "bad trainer." Unlike the plaintiff in *Williams*, Plaintiff in this matter does not argue that she experienced a change in duties or that her supervisor changed. Instead, her duties remained the same and she reported to the same Med-Peds program director, Dr. Dennar, throughout her residency.

Finally, Plaintiff claims she was deprived of her vacation pay and that this is an adverse employment action because it affected her compensation.[104] In her sur-reply, Plaintiff relies on *Simmons v. Methodist Hosps. of Dallas* to argue that Tulane's failure to allow her to complete her away rotations without using her vacation benefit constituted an adverse employment action.[105] In *Simmons*, an internal medicine resident was formally suspended after he had conflicts with other doctors due to incidents of miscommunication and the refusal of hospital officials to accommodate his requests for vacation time. But in Simmons, in addition to the hospital's vacation time refusal, the plaintiff raised multiple allegations against the hospital, including that it unlawfully suspended *and terminated him*.[106] The court found the plaintiff met his burden of alleging he experienced an adverse employment action with his vacation time allegation *in conjunction with his ultimate termination*.[107] The court stated in a footnote, however, that he "provide[d] no legal support for the theory that limiting available vacation days may be an adverse employment action, but for purposes of this Order, the Court will assume without deciding that it is. His eventual firing is, of course, an adverse employment action."[108] Plaintiff has not provided any support for her argument that she

---

[104] R. Doc. 55 at 15-16.
[105] *Simmons v. Methodist Hosps. of Dallas*, Civ. No. 3:11-cv-17-B (N.D. Tex. Apr. 26, 2012).
[106] *Id*. at 3-4.
[107] *Id*. at 8.
[108] *Id*. at 8 n.2.

suffered an adverse employment action based on her having to use her vacation time for her away rotation.

The harms cited by Plaintiff are not adverse employment actions because they do not involve "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Plaintiff has not carried her burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act. Plaintiff's Title VII claim for disparate treatment sex and race discrimination fails for this reason alone.

Because Plaintiff has not met the third element of her prima facie case, it is not necessary for the Court to address the fourth element of Plaintiff's prima facie case—that she was treated less favorably than her white male counterparts—but the Court finds that Plaintiff has not established this element of her prima facie case. Although a comparator need not be identical, the employees should have the same job or responsibilities and share the same supervisor.[109] Plaintiff in her opposition to the motion argues Michael Gillette and Plaintiff worked together as residents under the supervision of Dr. Jeffery Wiese.[110] Elsewhere, Plaintiff repeatedly states Dr. Wiese was the program director for the internal medicine program, in which Dr. Gillette was enrolled, and Dr. Dennar was the program director for the Med-Peds program, in which Plaintiff was enrolled.[111] Plaintiff also points to Dr. Caldwell as a comparator. She admits Dr. Gillette was in the Global Health Program, in which residents participate in away rotations as part of that program, and she was not.[112] Plaintiff identified Dr. Caldwell as a Chief Resident,[113] which she was

---

[109] *Wallace v. Seton Family of Hospitals*, 777 F.App'x 83, 87-88 (5th Cir. 2019).
[110] R. Doc. 55 at 16.
[111] *Id.* at 3-5, 8.
[112] R. Doc. 55-17 at p. 7.
[113] R. Doc. 51-2 (citing R. Doc. 51-2 at 24:8-19.)

not. Plaintiff has not shown that she and her purported comparators had the same job or responsibilities or that they shared the same supervisor. Even viewed in the light most favorable to Plaintiff, the facts do not show that these comparators were similarly situated to Plaintiff.

The Court also notes that, in her opposition to the motion for summary judgment, Plaintiff offers what she represents as statistical evidence[114] of heavier workloads imposed on the Med-Peds residents, all non-white women, to show that Plaintiff was treated less favorably than white male residents.[115] Plaintiff argues "statistical evidence is also of central importance in a disparate treatment case. It may be used to show both motive and a pattern or practice of racial discrimination."[116] Tulane counters that statistical evidence is not appropriate in an individual disparate treatment claim and that, even if admissible, the statistical evidence offered by Plaintiff is not reliable.[117]

"Statistics may be used in an attempt to establish or rebut a prima facie case of disparate impact discrimination or class-wide intentional or pattern-or-practice discrimination, or to assist in showing that the defendant's articulated reasons for an individual employment decision are pretextual. Statistics can be useful, but generally are not determinative on the question of discriminatory intent in individual cases."[118] The Plaintiff brought only individual sex and race discrimination disparate treatment claims.[119] In an individual disparate treatment case, "an individual plaintiff pursuing an

---

[114] R. Doc. 55-12, R. Doc. 55-13, R. Doc. 55-8, R. Doc. 55-11.
[115] R. Doc. 55 at 19.
[116] *Id.*
[117] R. Doc. 61 at 8.
[118] Barbara T. Lindemann, Paul Grossman, and Geoff Weirich, *Employment Discrimination Law* 35.II (Laurie E. Leader et al. eds., 6th ed. 2020).
[119] *See* Fn. 1. The Plaintiff relies on *Wilkins v. University of Houston*, 654 F.2d 388, 395 (5th Cir. 1981) and *Pouncy v. Prudential Inc. Co. of America*, 668 F.2d 795 (5th Cir. 1982), for the proposition that a prima facie case may be made in an individual case based on gross statistical disparities, but the sections she cites in both cases deal with *class action* disparate treatment claims.

individual claim may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct, such as general statistical evidence."[120] Instead, a plaintiff must present prima facie evidence that she individually was treated less favorably than a specific similarly situated employee.[121] Statistical evidence may not be used for this purpose.

### III.   Summary Judgment is Granted on Plaintiff's Title VII hostile work environment claim.

Count three of Plaintiff's complaint is that Tulane subjected Plaintiff to "unwelcome harassment" based on her race and gender.[122] A plaintiff asserting a hostile work environment claim under Title VII must show she: (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in a protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) Tulane knew or should have known of the harassment in question and failed to take prompt remedial action.[123]

For the purposes of this motion, Tulane admits Plaintiff belongs to protected groups as a female resident asserting sex discrimination and as a Black resident asserting race discrimination. Tulane argues it is entitled to summary judgment because there is no evidence in the record—and Plaintiff will not be able to prove at trial—that Plaintiff suffered unwelcome harassment that affected a term, condition, or privilege of her employment, that the harassment complained of was based on her membership in a protected group, or that Tulane failed to take prompt, remedial action. The Court will

---

[120] *Taylor v. United Parcel Service, Inc.,* 554 F.3d 510 (5th Cir. 2008).
[121] *Id.*
[122] R. Doc. 30 at ¶¶ 70-71.
[123] *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

consider Plaintiff's summary judgment evidence in the light most favorable for her to determine whether her hostile work environment claim survives summary judgment.

A hostile work environment results from discrimination that does not culminate in a tangible employment action.[124],[125] All circumstances related to the employment "must be taken into consideration" to determine whether a work environment is sufficiently hostile.[126] To satisfy the sufficiently severe or pervasive test, the environment must be pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere.[127] "Title VII . . . is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[128]

Plaintiff alleges Dr., Weise "remarked that Dr. Okeke and other Black female residents were not 'team players' if they ever voiced complaints about their schedules or discriminatory treatments.'"[129] She also alleges, "Dr. Wiese intimidated her and other residents when he stormed into a group learning session and stated that more of the residents needed to be 'team-players,' that the ACGME 'requirements' for the Emergency Department rotations for Dr. Okeke and other Black female residents did not matter to him, and that '. . . nobody else matters."[130] She alleges Dr. Wiese chastised her for not

---

[124] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

[125] The *McDonnell Douglas* burden-shifting analysis—which allows the Government to proffer a legitimate, nondiscriminatory reason behind its actions—does not apply to this claim because the Government cannot offer a legitimate reason for creating such an environment. *See EEOC v. Bass Pro Outdoor World, LLC*, 35 F.Supp.3d 836 (S.D. Tex. July 30, 2014) ("hostile work environment claims are not proven using McDonnell Douglas or any other burden-shifting scheme").

[126] *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

[127] EEOC v. Central Wholesalers, Inc., 573 F.3d 167 (4th Cir. 2009).

[128] *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007) (quotations omitted).

[129] R. Doc. 30 at ¶ 40(g).

[130] *Id*. at ¶ 34.

being a "team-player" when she refused to provide jeopardy coverage to other residents when the predominantly white internal medicine residents were not required to do so.[131] Dr. Wiese allegedly "refused to further discuss these issues, dared the residents to contact ACGME, and stated that he would be okay with getting "a slap on the wrist.""[132]

In her deposition, Plaintiff testified that when emergency department time was requested by some residents, Dr. Wiese "came in the room at one of [their] didactic sessions" and told them that they "weren't being team players."[133] Plaintiff also testified the following encounters created a hostile environment on the basis of race and gender: i) Dr. Wiese introduced himself at a party to a group of people including Plaintiff, leading Plaintiff to believe Dr. Wiese did not recognize her; ii) Dr. Wiese "kind of disregarded me, like not knowing my name;" iii) Plaintiff's name was not initially listed on an email congratulating those who obtained fellowships, iv) while speaking at "Monday school," which is attended by all residents, Plaintiff "felt that he was speaking directly to me" when Dr. Wiese made statements that "referenced people asking for elective time and ED time," even though "he did not call us out by name."[134] In his deposition, Dr. Wiese testified his "team players" comment was with respect to "everybody doing their proportion of systole and not trying to find ways to do less of their wards ICU, CCU, night flow responsibilities."[135]

Plaintiff also points to the deposition of Dr. Dennar in which Dr. Dennar testified, "I recall a comment that was made at the time stating that [Plaintiff] had failed her steps

---

[131] *Id.* at ¶ 40(f). Dr. Marsh explained Jeopardy is the system used to cover for a resident who has an unexpected absence. R. Doc. 51-7 at 32:19-33:1.
[132] *Id.* at ¶ 35.
[133] R. Doc. 51-2 at 128:21-129:2.
[134] *Id.* at 189:13-14, 16-24; 237:11-18; 238:9, 12-15; 240:607.
[135] R. Doc. 51-5 at 72:9-17. Dr. Wiese explained in his deposition that systole rotations are more demanding because they involve night calls. R. Doc. 51-4 at 93:12-23.

by white faculty. And I informed them that she had not failed her steps, and very often when a black face appeared on the screen they would talk about their academic performance being -- and were they able to complete their boards and do well at Tulane in the very disparaging way. Dr. Okeke was one of those people that they spoke about."[136] Dr. Dennar further testified that, after the Med-Peds residency program accepted an all-female minority class, "one of the chairmen stated that [they] would need to -- in one of [their] conversations afterwards, that in the future [they] would need to review the rubrics that [she] used to -- the metrics that [she] used to actually rank [her] applicants."[137] Plaintiff also points to an email in which Dr. Wiese indicates his intent to reduce the Med-Peds residency program and cites "some cultural issues that are arising out of the med-peds program."[138] These statements were not made in Plaintiff's presence, nor is it clear these statement were directed at her. In *Septimus v. Univ. of Houston*, the Fifth Circuit refused to find a hostile working environment after finding the plaintiff "did not personally experience most (if not all) of the conduct complained of by the other women."[139] In *Hernandez v. Yellow Transp. Inc.*, the Fifth Circuit found that a white plaintiff failed to "point to specific facts in the record to demonstrate that the company knew or should have known that [he personally] was harassed" despite there being "substantial evidence in the record that in this workplace, many workers treated other workers [African-Americans and Hispanics] profanely, cruelly, and with hostility."[140]

Discriminatory intimidation, ridicule, or insults must be sufficiently severe or pervasive to affect the conditions of Plaintiff's employment. In the Fifth Circuit, this is a

---

[136] R. Doc. 55-1 at 23:24-24:8.
[137] *Id.* at 24:9-25:1.
[138] R. Doc. 55-7 at 1.
[139] 399 F.3d 601, 612 (5th Cir. 2005).
[140] 670 F.3d 644, 654-55 (5th Cir. 2012).

difficult standard to meet. As an example, in *DeAngelis v. El Paso Mun. Police Officers Ass'n*, a female sergeant sued her officers association for regular publication of a column in its newsletter that ridiculed her as "sergeant dingy woman," longed for "the good ol' days when finding the criminal was more important to the patrolmen then keeping your hair in place," and published other insulting writings.[141] The Fifth Circuit found the writings, although they included derogatory references about the female sergeant, were "the equivalent of the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee" and therefore did not constitute a hostile work environment.[142] In *Mendoza v. Bell Helicopter and Textron, Inc*, a Hispanic toolmaker was subject to racist remarks from co-workers such as "what river [did] you cross?" or "can you speak English?" and given a flyer that said, "Hispanics should go back to Mexico."[143] The Fifth Circuit upheld the district court's grant of summary judgment in favor of the employer on the toolmaker's hostile work environment claim because the complained of conduct "occurred sporadically over a several year period" and "no single incident was severe enough to independently support a hostile work environment claim."[144]

Plaintiff's allegations, even if considered true or viewed in the light most favorable to her, do not rise to the level of a hostile work environment under Fifth Circuit jurisprudence. At most, Plaintiff was told she was not a team player, Dr. Wiese did not recognize her at a party, Dr. Wiese disregarded her by not knowing her name, and her name was left off an email congratulating all those who had obtained fellowships.[145]

---

[141] 51 F.3d 591, 594-95 (5th Cir. 1995).
[142] *Id.* at 595 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).
[143] No. 10-cv-603, 2012 WL 12878157 (N.D. Tex. Oct. 3, 2012).
[144] *Mendoza v. Bell Helicopter and Textron, Inc.*, 548 Fed.Appx. 127 (5th Cir. 2013).
[145] The comments made in Dr. Dennar's, but not Plaintiff's, presence cannot be used to satisfy this element.

Dr. Wiese's comments are not acts of severe race-based or sex-based harassment and neither are they pervasive. This claim fails as a matter of law.

## CONCLUSION

**IT IS ORDERED** that the motion for summary judgment by the Administrators of the Tulane Educational Fund is **GRANTED**.

**New Orleans, Louisiana, this 21st day of May, 2021.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**