UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. OCHEOWELLE OKEKE,<br>    Plaintiff | CIVIL ACTION |
| VERSUS | NO. 20-450 |
| ADMINISTRATORS OF THE<br>TULANE EDUCATIONAL FUND,<br>    Defendant | SECTION: "E" |

## ORDER AND REASONS

Before the Court is the Motion for Summary Judgment by Defendant The Administrators of the Tulane Educational Fund ("Tulane") on Plaintiff's disparate impact race and sex discrimination claim.[1]

For the reasons that follow, the motion is **GRANTED**.

## STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] "An issue is material if its resolution could affect the outcome of the action."[3] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[4] All reasonable inferences are drawn in favor of the nonmoving party.[5] There is no genuine issue of material fact if, even viewing the evidence in the light most

---

[1] R. Doc. 70. Plaintiff filed an Opposition. R. Doc. 74. Tulane filed a reply. R. Doc. 76.
[2] Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[3] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[4] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); S*ee also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[5] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

1

favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party, thus entitling the moving party to judgment as a matter of law.[6]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[7] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the nonmoving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[8]

If the dispositive issue is one on which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim.[9] When proceeding under the first option, if the nonmoving party cannot muster sufficient evidence to dispute the movant's contention that there are no disputed facts, a trial would be useless, and the moving party is entitled

---

[6] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[7] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).
[8] *Celotex*, 477 U.S. at 322–24.
[9] *Id.* at 331–32 (Brennan, J., dissenting); *see also St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citing Justice Brennan's statement of the summary judgment standard in *Celotex*, 477 U.S. at 322–24, and requiring the Movers to submit affirmative evidence to negate an essential element of the nonmovant's claim or, alternatively, demonstrate the nonmovant's evidence is insufficient to establish an essential element); *Fano v. O'Neill*, 806 F.2d 1262, 1266 (citing Justice Brennan's dissent in *Celotex*, and requiring the movant to make an affirmative presentation to negate the nonmovant's claims on summary judgment); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2727.1 (2016) ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case." (internal citations omitted)).

to summary judgment as a matter of law.[10] When, however, the movant is proceeding under the second option and is seeking summary judgment on the ground that the nonmovant has no evidence to establish an essential element of the claim, the nonmoving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[11] Under either scenario, the burden then shifts back to the movant to demonstrate the inadequacy of the evidence relied upon by the nonmovant.[12] If the movant meets this burden, "the burden of production shifts [back again] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)."[13] "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial."[14]

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her

---

[10] *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89 (1968); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).
[11] *Celotex*, 477 U.S. at 332–33.
[12] *Id.*
[13] *Celotex*, 477 U.S. at 332–33, 333 n.3.
[14] *Id.*; *See also First National Bank of Arizona*, 391 U.S. at 289.

claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[15]

**LAW AND ANALYSIS**

I. **Exhaustion of Administrative Remedies.**

On November 11, 2019, Plaintiff received a notice of right to sue from the EEOC.[16] In its Motion for Summary Judgment, Tulane argues Plaintiff failed to administratively exhaust her disparate impact claim related to hospital shift scheduling.[17] Tulane argues Plaintiff "waived this claim by not preserving it in an EEOC Charge."[18] Tulane states that the "only possible disparate impact claim that Plaintiff administratively exhausted would involve her Charge allegation that 'Dr. Wiese used a program for recruiting people into the Med-Peds program that created a disparate impact on minority students.'"[19] Tulane argues this claim of disparate impact in recruiting is "not remotely related to the hospital shift scheduling process," which Plaintiff now argues created a disparate impact.[20] Tulane argues Plaintiff's claim regarding disparate impact in hospital shift scheduling is "a wholly new disparate impact claim that [Plaintiff] never preserved at the EEOC stage."[21]

Plaintiff argues she sufficiently exhausted her administrative remedies.[22] In her Opposition to Tulane's Motion for Summary Judgment, Plaintiff states the EEOC Charge contains "both a factual basis and specifically alleges a disparate impact claim," and that "[t]he facts set forth in the EEOC Charge indicate more than one claim for disparate

---

[15] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[16] R. Doc. 30 at ¶ 9.
[17] R. Doc. 70-1 at p. 10.
[18] *Id.*
[19] *Id.* at p. 11.
[20] *Id.* R. Doc. 74 pp. 12–24.
[21] R. Doc. 70-1 at p. 10.
[22] R. Doc. 74 at p. 6.

4

impact."[23] Plaintiff argues her EEOC Charge set forth complaints "about the scheduling practices of Tulane, which disproportionately negatively affected female and minority residents."[24] Plaintiff argues

> The Court need not look that far beyond the actual statements in the four corners of the EEOC Charge as facts regarding the employment practices including unfair schedules, disproportionate work schedules, interference with graduation requirements, and the ATLAS recruiting tools and how they disproportionately affect minorities are specifically stated in the EEOC Charge and repeated in the Complaint and the Amended Complaint. However, even assuming that the facts are not by themselves sufficient, the facts given are sufficient to suggest a claim of disparate impact that can "grow out" of those facts.[25]

Plaintiff specifically points to the following language in her EEOC Charge, which she argues contains a factual basis for a claim of disparate impact in scheduling:

> Dr. Wiese limited the Charging Parties' ability to complete the core program requirements established by the Accreditation Council for Graduate Medical Education (ACGME), by unfairly scheduling female and minority residents, by giving them excessively high-service-demand rotations and by then restricting their ability to make reasonable adjustments to those schedules. Dr. Wiese unfairly scheduled the Charging Parties (minority residents) to disproportionate and inflexible work schedules, compared to their non-minority counterparts. Despite repeated and specific requests to correct these schedules, the Internal Medicine Department continues to violate the requirements of ACGME and the university's agreement to provide adequate and appropriate residency training.
>
> Further, Dr. Wiese responded to a Town Hall Meeting request in a discriminatory manner; used a program for recruiting people into the Med-Peds program that created a disparate impact on minority students; denied a recruiting request to fill two vacant Med-Peds positions; and demonstrates a trend of undermining the authority of female residents.
>
> The Charging Parties assert that the leadership of the Internal Medicine program has ignored their repeated requests to address the culture of inappropriate behavior that has had a disparate impact on minority students. Dr. Wiese, as head of the Internal Medicine Program, directly fostered this unjust work environment for residents of color, relating to meeting their core requirements for graduation, work schedules meeting

---

[23] *Id.*
[24] *Id.* at p. 2.
[25] *Id.* at p. 8.

5

professional and personal needs, and receiving an educational and work experience free of marginalization and explicit bias. Nonminority residents are not subjected to these issues.[26]

A complainant must file a timely charge with the EEOC or other state or local agency prior to commencing a civil action in federal court under Title VII.[27] In deciding whether an EEOC Charge exhausts a particular claim, the EEOC Charge is to be construed broadly, as Title VII "was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship."[28] While the Court may construe a Charge broadly, the Court will only find that a Charge exhausts a claim when the claim could "reasonably be expected to grow out of the Charge of discrimination."[29] An employee may file a civil action "not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the Charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination."[30]

The Court agrees with Plaintiff that, although she apparently was represented by counsel at the time, her EEOC charge is interpreted broadly enough to exhaust her claim of disparate impact in shift scheduling. First, the Charge specifically mentions that female and Black residents have suffered disparate impacts as a result of work scheduling.[31] Additionally, even if the language of the charge were not specific enough, a claim of disparate impact in shift scheduling can reasonably be expected to grow out from the

---

[26] *Id.* at p. 6; R. Doc. 74-2.
[27] 42 U.S.C. § 2000e-5 (2012).
[28] *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)).
[29] *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)
[30] *Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 451 (5th Cir. 1983).
[31] R. Doc. 74 at p. 6; R. Doc. 74-4 at p. 2.

Charge's factual assertions regarding disparities and unfairness in shift scheduling.[32] The EEOC Charge is sufficient to satisfy the exhaustion requirement.

Nevertheless, even though Plaintiff properly exhausted her administrative remedies on her disparate impact claim relating to hospital shift scheduling, the Court finds Plaintiff cannot succeed on her disparate impact claim. Plaintiff failed to specifically identify a particular, facially neutral policy or practice that had a causal relationship to a disparate impact on minority female residents.

## II. Summary Judgment is Granted on Plaintiff's Title VII Disparate Impact Sex and Race Employment Discrimination Claims.

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment, including both disparate treatment discrimination and disparate impact discrimination.[33] A plaintiff may establish a prima facie case of disparate impact employment discrimination under Title VII only if she demonstrates that her employer uses "a *particular employment practice* that causes a disparate impact on the basis of race, color, religion, sex, or national origin . . . ."[34] In order to demonstrate that a particular employment practice causes a disparate impact, the plaintiff must "demonstrate that each particular challenged employment practice causes a disparate impact."[35]

Hence, to establish a prima facie disparate impact claim, the plaintiff must identify the following three elements: (1) a specific, facially neutral policy or practice of the employer; (2) a disparate, adverse effect on a protected group; and (3) a causal nexus between the adverse effect and the policy or practice.[36] "Plaintiffs alleging a Title VII

---

[32] *Id.*
[33] *See id.* § 2000e-2(a).
[34] *Id.* § (k)(1)(A)(i). (emphasis added)
[35] *Id.* § (k)(1)(B)(i).
[36] *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 799–800 (5th Cir. 1982).

disparate impact claim must identify specific practices as being responsible for any observed disparities," and also must "conduct a systemic analysis of those employment practices in order to establish their case."37 The particularity requirement of the disparate impact theory of liability imposes on a plaintiff an obligation to "isolate and identify," a specific employment practice allegedly responsible for the complained-of disparity.38 As discussed below, Plaintiff has failed to isolate and identify a particular employment practice responsible for the alleged disparity. As a result, Plaintiff cannot establish the first element of her prima facie case of disparate impact employment discrimination, and her claim must fail.

The basis of Plaintiff's disparate impact claim is that Tulane's hospital shift scheduling for residents "disproportionately negatively affected female and minority" resident physicians at Tulane.39 Plaintiff argues that Black female residents disproportionately experienced "harder rotations, lack of important training required for graduation, and changes in employment conditions while rotating through Internal Medicine."40 Plaintiff's burden, however, goes beyond pointing to alleged disparities—"[t]he plaintiff must begin by identifying the specific employment practice that is challenged."41

In her Opposition, Plaintiff argues she identified employment practices in her Complaint that caused disparate impacts on the protected group.42 Plaintiff points to the allegations in her complaint that

---

37 *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).
38 *Johnson v. Uncle Ben's, Inc.*, 965 F2d 1363, *cert denied*, 511 U.S. 1068.
39 R. Doc. 74 at p. 2.
40 *Id.* at p. 4.
41 *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988).
42 R. Doc. 74 at p. 11.

8

> [a]t the end of the academic year, residents in their second, third and fourth years in the Pediatric and the Internal Medicine residency programs meet and prepare a template for their proposed upcoming schedules for the Pediatric part and the Internal Medicine part.
>
> After the schedule template is prepared, the Chiefs and Program Director for the Pediatric Program send the proposed Pediatric schedule to the Med-Peds Program Director to approve and/or amend their schedule to meet the ACGME requirements.
>
> However, at all times relevant hereto, the Internal Medicine Program Chiefs and Dr. Wiese refused to send the proposed Internal Medicine schedule to Med-Peds Program Director Dr. Dennar to approve and/or amend the internal medicine portion of the schedule.[43]

Additionally, in her Opposition, Plaintiff points to the following as examples of employment practices or policies:

> Dr. Wiese's actions as DIO and Program Director of Internal Medicine, regarding how he subjectively chose to modify the residents' schedule which ultimately impacted 'other minority female residents.' Further . . . practices include decisions made regarding which residents get certain rotations and electives[,] decisions regarding which residents get Emergency Department rotations, and decisions regarding which rotations substituted for Emergency Department rotations-all of which affected minority residents disproportionately.[44]

Plaintiff also argues in her Opposition that

> Dr. Dennar's authority to approve Med-peds program schedules for residents was taken [by Dr. Wiese and] . . . [w]hether this 'subjective' interference with Dr. Dennar's scheduling authority and her management of residents was actually neutral or 'facially' neutral (i.e. hidden discrimination), the fact remains, these employment practices caused disparate results on minority female residents.[45]

None of the above described acts, however, is a policy or practice for purposes of establishing a prima facie disparate impact claim under Title VII. Examples of policies or practices cited in past disparate impact cases include high school diploma requirements,[46]

---

[43] R. Doc. 1, ¶¶ 28–30.
[44] R. Doc. 74 at p. 12.
[45] *Id.* at p. 14.
[46] *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

written aptitude tests,⁴⁷ written test of verbal skills,⁴⁸ a brief interview,⁴⁹ nepotism,⁵⁰ or height and weight requirements.⁵¹ Rather than isolating identified and particular employment practices, Plaintiff launches a broad-based claim against the cumulative effect of Tulane's hospital shift scheduling. Plaintiff's claim must fail because the disparate impact employment discrimination theory is not "the appropriate vehicle from which to lodge a wide-ranging attack on the cumulative effect of a company's employment practices."⁵²

Plaintiff points to the exception in 42 U.S.C. § 2000e–2(k)(1)(B)(i) which provides "if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice."⁵³ Plaintiff argues that "all of these various employment practices must be taken as one practice . . . [b]ecause several decisions were made without objective criteria."⁵⁴ Plaintiff cannot rely on this exception because she has not specifically identified particular, facially neutral policies or practices and, as a result, has not "demonstrated to the [C]ourt that the elements of [the employer's] decision making process are not capable of separation for analysis."⁵⁵

Plaintiff argues a combination of "objective" and "subjective" practices are responsible for the alleged disparities in scheduling experienced by the protected group.⁵⁶ Prior to its decision in *Watson v. Fort Worth Bank and Trust*, the Supreme Court applied

---

⁴⁷ *Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975).
⁴⁸ *Washington v. Davis*, 426 U.S. 229 (1976).
⁴⁹ *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 990 (1988).
⁵⁰ *Antonio v. Wards Cove Packing Co., Inc.,* 810 F.2d 1477 (1987).
⁵¹ *Dothard v. Rawlinson*, 433 U.S. 321 (1988).
⁵² *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 799–800 (5th Cir. 1982).
⁵³ *Id.* (quoting 42 U.S.C. § 2000e–2(k)(1)(B)(i)).
⁵⁴ R. Doc. 74 at pp. 15–16.
⁵⁵ 42 U.S.C. § 2000e–2(k)(1)(B)(i).
⁵⁶ R. Doc. 74 at p. 12.

10

the disparate impact theory to review employment decisions based on the use of standardized tests and other objective criteria,[57] and applied the "conventional disparate *treatment* theory . . . to review hiring and promotion decisions that were based on the exercise of personal judgment or the application of inherently subjective criteria."[58] In *Watson*, however, the Supreme Court held "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases."[59]

As the Supreme Court expressly recognized in *Watson*, however, "[e]specially in cases where an employer combines subjective criteria with the use of [objective criteria], the plaintiff is . . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."[60] The problem remains that Plaintiff has failed to isolate and identify specific employment practices, and labeling such practices as "subjective" and "objective," without actually identifying the practices, cannot save Plaintiff's claim from its deficiencies. Plaintiff still has not identified specific, particularized practices whether objective or subjective.

Furthermore, Plaintiff did not establish the existence of the other two elements necessary to make out a prima facie disparate impact claim—namely, disparate effects and causation.

In her opposition, Plaintiff argues a disparate effect on members of a protected group existed because "Dr. Okeke and black women rotating through Internal Medicine had harder rotation schedules than white males rotating through the Internal Medicine

---

[57] 487 U.S. 977, 991 (1988). *See, e.g.*, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).
[58] *Watson*, 487 U.S. at 988. (emphasis added)
[59] *Id.* at 991.
[60] *Id.* at 994.

program as proven by the 'AMION' schedules and that they received more difficult rotations . . . than whites and received less time to take electives."[61]

Proving the disparate effect element of a prima facie disparate impact case "typically requires establishing that the practice or policy had a statistically significant adverse impact on the protected class."[62] In *Munoz v. Orr*, the Fifth Circuit Court of Appeal observed that "claims of disparate impact under Title VII must, of necessity, rely heavily on statistical proof."[63]

In her Opposition, as proof of a disparate effect, Plaintiff asks the Court to consider, *inter alia*, "Dr. Dennar's analysis of the schedules" of her Black female Med-Peds residents compared with the schedules of white male Internal Medicine residents, as well as Plaintiff's own statistical calculations "regarding the schedules for all residents under Dr. Wiese."[64] The evidence Plaintiff asks the Court to consider as proof of a disparate effect is not competent summary judgment evidence for several reasons.

First, Plaintiff's "statistical calculations" were untimely submitted.[65] The scheduling order provides that all discovery shall be completed in this matter by December 15, 2020.[66] This statistical calculations were first submitted into the record on January 19, 2021, as part of Plaintiff's Opposition to Tulane's first motion for Summary Judgment.[67] In addition, Plaintiff did not list her statistical calculations as an exhibit on her exhibit list or her amended exhibit list.[68] There is no indication that this document

---

[61] R. Doc. 74 at p. 17.
[62] *Canada v. Tex. Mut. Ins. Co.*, 766 F. App'x 74, 78 (5th Cir. 2019).
[63] 200 F.3d 291, 300 (5th Cir. 2000).
[64] R. Doc. 74 at p. 20 (citing to R. Doc 74-9 for Dr. Dennar's analysis and to R. Doc. 55-11 for Plaintiff's analysis and graphs).
[65] *See* R. Doc. 55-11.
[66] R. Doc. 17 at p. 9. *See* R. Doc. 17-1 at p. 3 (stating that "all discovery shall be completed not later than December 15, 2020.").
[67] *See* R. Doc. 55-11.
[68] *See* R. Docs. 37, 46.

was produced to Tulane before it was attached to her Opposition to Tulane's first motion for summary judgment.[69] Dr. Dennar's analysis was listed on Plaintiff's amended exhibit list.[70] Although discovery was complete on December, 15, 2020, Dr. Dennar's analysis was produced on December 22, 2020; however, that delay is not material. Dr. Dennar was listed on Plaintiff's witness but there is no indication that Dr. Dennar would testify as an expert statistician.[71] Tulane's statement of uncontested material facts reflects that Plaintiff did not identify any expert witness,[72] and Plaintiff did not deny or contest that she did not identify any expert witness.[73]

Second, the analyses of the schedules relied upon by Plaintiff was conducted by Plaintiff and by Dr. Dennar. These analyses are unreliable. Plaintiff did not retain an expert statistician to analyze the schedules and identify and explain the alleged disparities.[74] Plaintiff instead attached the AMION schedules, analyzed them herself, and made conclusory assertions about what the schedules prove—as she argues, that there was a disparate effect on Black women.[75] Similarly, Plaintiff relies on analysis conducted by Dr. Dennar, who "compared the schedules of her black female residents on Internal Medicine rotations with white male residents in Internal Medicine," as measured against the "standard amount of time" for inpatient wards, subspeciality time, and elective time for both Med-Peds residents and categorical Internal Medicine residents.[76] Dr. Dennar analyzed this data herself and concludes female Med-Peds residents of color "received higher than standard wards as compared to their white male counterparts," and "received

---

[69] R. Doc. 55-11.
[70] R. Doc. 46 at p. 5.
[71] *See* R. Doc. 37.
[72] R. Doc. 70-2 at ¶ 12.
[73] R. Doc. 74-1 at ¶ 12.
[74] R. Doc. 37 (Plaintiff's Witness List).
[75] R. Doc. 74 at pp. 17-19.
[76] *See* R. Doc. 74-9.

lower than the standard required weeks of subspeciality and elective time in comparison to their white male counterparts."[77]

It is not at all clear the data and the analyses of the data—conducted by Plaintiff and Dr. Dennar—proves what Plaintiff and Dr. Dennar assert it proves.[78] This is largely because, as explained above, Plaintiff failed to retain an expert to conduct the analysis of the schedules and draw the comparisons between the schedules of the female Med Peds residents of color and the white male Internal Medicine residents. Plaintiff and Dr. Dennar are physicians—not statisticians—and they are not qualified to make these data analyses and data comparisons on their own. Plaintiff and Dr. Dennar "cannot draw statistical inferences from data because [they are] not an expert[s]."[79] The data analyses conducted by Plaintiff and by Dr. Dennar are unreliable. Plaintiff has not shown that a practice or policy had a statistically significant adverse impact on a protected class.

In order to establish the causation element a plaintiff typically "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [disparate effect]" on members of a protected group.[80] In her Opposition, Plaintiff argues that "[b]ut for these employment practices, Dr. Okeke and minority women residents would not have been impacted with less opportunities than white male residents for elective and more ward rotations."[81] "[N]ormally a plaintiff must provide comparative statistical evidence demonstrating a disparity in impact of a particular

---

[77] *Id.*
[78] *See* R. Doc. 74 at pp. 17–19; *See also* R. Doc. 74-9 at p. 4.
[79] *Munoz v. Orr,* 200 F.3d 291, 304 (5th Cir. 2000).
[80] *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988).
[81] R. Doc. 74 at p. 21.

policy" to show the policy predictably results in discrimination and does not "merely raise an inference of discriminatory impact."[82]

Plaintiff relies on *Garcia v. Women's Hospital of Texas*, in which the Fifth Circuit noted that a disparate impact plaintiff can prove causation without statistical evidence when the plaintiff can show that the challenged practice would disproportionately impact all or substantially all members of the protected class.[83] In her Opposition, Plaintiff focuses on the effects of the work schedules on black female Med-Peds residents rotating through Internal Medicine. Plaintiff has focused on a small, selective group, and has presented no evidence that all Black people or all women would be disparately impacted.[84] *Garcia* does not apply.[85] Accordingly, Plaintiff must rely on statistical evidence, and statistical analyses and comparisons. As discussed above, Plaintiff's statistical evidence and statistical analyses are not admissible because they were, for the most past, untimely produced and have not been shown to be reliable.

Even more fundamental is the fact that Plaintiff faces an insurmountable hurdle in proving causation because "a disparate impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies that cause the disparity."[86] Because Plaintiff failed to a identify a specific, particular facially neutral

---

[82] *Treece et al. v. Perrier Condo, Owners Assoc., Inc., et al.*, 2020 WL 759567 (E.D.La. Feb. 14, 2020)
[83] 97 F.3d 810, 813 (5th Cir. 1996).
[84] R. Doc. 74 at pp. 16–17 (arguing that the 'employment practices by Dr. Weise' "disproportionately affected black women who were . . . rotating through their Internal Medicines schedules within their Med-Peds program . . . ."). *See id.* at pp. 17-19 (Plaintiff's own statistical analyses of the schedules focusing solely on black female Med-Peds residents rotating through Internal Medicine).
[85] R. Doc. 74 at pp. 16–17 (arguing that the 'employment practices by Dr. Weise' "disproportionately affected black women who were . . . rotating through their Internal Medicines schedules within their Med-Peds program . . . ."). *See id.* at pp. 17-19 (Plaintiff's own statistical analyses of the schedules focusing solely on black female Med-Peds residents rotating through Internal Medicine).
[86] *Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015).

employment practice, and failed to provide evidence of a disparate effect, Plaintiff clearly cannot prove a causal relationship between the two.[87]

Even considering the facts alleged by Plaintiff to be true, Defendants are entitled to judgment as a matter of law.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that the motion for summary judgment by The Administrators of the Tulane Educational Fund is **GRANTED**.

**New Orleans, Louisiana, this 26th day of June, 2021.**

                                                  *Susie Morgan*
                                        **SUSIE MORGAN**
                             **UNITED STATES DISTRICT JUDGE**

---

[87] In fact, in her Opposition, Plaintiff states that a "racially motivated power struggle between program directors caused disproportionately harder rotations." R. Doc. 74 at pp. 4, 5, 14. This is not a facially neutral employment policy or practice for purposes of a disparate impact claim.